FILED'08 APR 28 15:06 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARY ANN HUFF,                              Civ. No. 05-1831-AA

        Plaintiff,                          OPINION AND ORDER

    v.

CITY OF PORTLAND & ZARI SANTNER,

        Defendants.

_____

Lynn Reiko Nakamoto
Markowitz Herbold Glade & Mehlhaf, PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204
        Attorney for Plaintiff

David A. Landrum
Jennifer M. Johnston
City Attorney's Office
1221 S.W. Fourth Avenue, Suite 430
Portland, OR 97204
        Attorneys for Defendants

AIKEN, Judge:

    Plaintiff Mary Ann Huff filed suit against the City of

Portland ("City") and her former supervisor, Zari Santner, alleging

1    -  OPINION AND ORDER

whistleblower retaliation under Or. Rev. Stat. § 659A.203, wrongful discharge, and violations of her First Amendment and equal protection rights under 42 U.S.C. § 1983.   Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 on all of plaintiff's claims.   Defendants argue that plaintiff cannot establish a prima facie case for her whistleblower, wrongful discharge, and First Amendment claims, and that her "class of one" equal protection claim is inapplicable in the context of public employment.

On April 11, 2008, the court heard oral argument.   For the reasons given below, defendants' motion is GRANTED.

## I. BACKGROUND

From 2000 to January 2005, the City employed plaintiff as the "Tier One" Operations Division Manager of the Portland Bureau of Parks and Recreation ("Bureau").   In this role, plaintiff was responsible for a budget of approximately $20 million and between 180 and 300 employees serving numerous parks and buildings throughout the City.   During plaintiff's tenure, the Bureau experienced budget cuts that resulted in facility closures and other reductions in services available to City residents. Plaintiff alleges that in those lean years she was the only Tier One manager to stay within budget.

In April 2003, the City promoted Santner from a Tier One management position to Bureau Director, and she became plaintiff's supervisor.

2   -   OPINION AND ORDER

In early 2004, plaintiff questioned the Bureau's expenditure of general fund monies to provide an annual six-figure subsidy to the Portland Metropolitan Softball Association, Inc. ("PMSA"). PMSA is a non-profit community organization that partnered with the Bureau to provide a citywide softball program.  PMSA also operated the William Owens Softball Complex at the City's East Delta Park ("Park").[1]  Between April and July of 2004, plaintiff reviewed PMSA's operations at the Park, particularly PMSA's use of financial resources.  Plaintiff learned that the Park was supposed to have become self-supporting by the late 1990s, and that contrary to what the Bureau's cost-of-services analysis reflected, the Park was operating at a significant loss to the City.  The Tier One manager in charge of the Bureau's contracts with PMSA was Lisa Turpel, the Recreation Division Manager.  Turpel supervised Bob Schulz, the Recreation Manager.

At a meeting with Schultz and PMSA representatives in April 2004, Schulz asked plaintiff to transfer funds from her budget to the Recreation Division's budget to pay for a truck for maintenance at Erv Lind Stadium, another of the Bureau's softball facilities. In response, plaintiff asked to examine PMSA's books but was told

---

[1]The Park's facilities include soccer and softball fields, such as the Owens Softball Complex, that are used for regional and national tournaments and require a higher level of maintenance than fields at other City parks.  Other facilities at the Park include playgrounds, batting cages, restrooms, and a model airplane area.  The Bureau is responsible for managing the Park's fields and facilities.

3    -  OPINION AND ORDER

that was not possible.

In July 2004, plaintiff reported to Santner that the Bureau was spending hundreds of thousands of taxpayers' dollars to subsidize PMSA's operations at the Park.  Plaintiff told Santner that the Bureau's subsidization of PMSA was improper in light of ongoing budget constraints that restricted her ability to deliver services to City residents.  Further, plaintiff believed that other Tier One managers favored the Park and its softball users at the expense of other parks.  Accordingly, plaintiff requested that the Bureau's fiscal analysis more accurately reflect the cost of services for PMSA and the Park.  More than once, plaintiff reported this alleged mismanagement of funds to Santner as well as Robin Grimwade, another Tier One Manager.

At one point in July 2004, Santner told plaintiff that she had been rude to PMSA's representative at the April meeting and asked plaintiff not to have any further contact with PMSA.  Instead, Santner told plaintiff that Turpel and Schulz would manage the PMSA relationship.

In the meantime, partly as a result of the fiscal constraints facing the City and the Bureau, the Bureau began a reorganization process.  In August 2004, Santner announced to the Tier One managers her plan to reorganize the Bureau's Tier One management positions: the Bureau would terminate all existing Tier One positions; a Change Management Team ("CMT"), including Santner and selected Tier One managers, would review the Bureau's management

4   -  OPINION AND ORDER

structure; the City's Bureau of Human Resources, in conjunction with Santner, would develop the requirements for "new" Tier One positions; and existing Tier One managers would have the opportunity to apply for the reclassified Tier One positions. Following the announcement, plaintiff was not selected to serve on the CMT, and Santner ceased scheduling one-on-one meetings with plaintiff.

On November 12, 2004, Santner notified plaintiff that the Bureau would terminate her Tier One position as a result of the reorganization. The job description for the new Tier One position incorporating plaintiff's previous duties emphasized recreational background, which plaintiff lacked, in addition to budgetary experience. Plaintiff did not apply for the new position.

On January 24, 2005, the City eliminated plaintiff's position. Santner immediately rehired plaintiff as a temporary management analyst, a position set to expire on June 30, 2005. Plaintiff's new supervisor was Grimwade, who had become the new Tier One Manager of the Bureau's Strategy, Finance, and Business Development Division. Plaintiff's job entailed reviewing Bureau contracts, including the one with PMSA, to verify compliance with the Bureau's new cost-of-services policy.

On April 7, 2005, plaintiff gave notice to the City Attorney of her intent to sue. Santner became aware of the notice soon thereafter, and notified Grimwade and told him to handle the PMSA contract review by himself.

5    - OPINION AND ORDER

In the meantime, pursuant to City regulations, plaintiff became eligible for redeployment. Plaintiff applied for a vacant position as a lower-level, "Tier Two" budget manager within the Bureau. On April 21, 2005, she interviewed for that position before a panel of three other City managers selected by Grimwade. The panel did not select plaintiff.

In the following weeks, plaintiff continued investigating PMSA on her own and obtained publicly-available tax records that indicated PMSA had a surplus of $600,000. Plaintiff recommended to Grimwade that the City Auditor perform an audit regarding PMSA's use of the Bureau's funds.

On June 30, 2005, as expected, defendants terminated plaintiff's temporary employment with the Bureau.

In August 2005, the City Auditor issued a report that confirmed that the City subsidized PMSA for roughly $100,000 annually, even though PMSA itself operated at a $70,000 annual surplus and had a fund balance of approximately $600,000. The audit labeled the contractual relationship between the Bureau and PMSA as "unclear and unnecessarily complex." Declaration of Lynn Nakamoto, Ex. C, p. 1. The audit disapproved of the City's subsidization of PMSA.

On October 14, 2005, plaintiff filed suit. She does not argue that defendants undertook the Bureau's reorganization in order to terminate her employment in retaliation for her investigation of and complaints about PMSA. Rather, plaintiff argues that Santner

6    - OPINION AND ORDER

used the reorganization as an opportunity to terminate her based on her complaints about the Bureau's relationship with PMSA. Plaintiff alleges that Santner excluded her from the CMT meetings discussing the reorganization and invited other similar managers to participate.  Plaintiff alleges that she did not receive e-mails discussing the new Tier One position and that Santner's executive assistant, Darlene Carlson, discouraged her from applying for the position.  Finally, plaintiff claims that defendants did not redeploy her for the Tier Two position in retaliation for her complaints about the Bureau and PMSA.

II. STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The materiality of a fact is determined by the substantive law on the issue. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a

7   - OPINION AND ORDER

genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## III. DISCUSSION

## A. Whistleblowing

Under Oregon's whistleblower statute, Or. Rev. Stat. § 659A.203(1), it is an unlawful employment practice for any public employer, such as the City, to:

> (b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:
>
>> (A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;
>> (B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision...

Under Or. Rev. Stat. § 659A.203(1)(d), it is unlawful for the City to "[d]iscourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section."

8    -   OPINION AND ORDER

Defendants argue that plaintiff cannot satisfy several requirements of the whistleblower statute. First, defendants contend that plaintiff did not make a "disclosure" under the meaning of the statute. Second, defendants claim that plaintiff did not "reasonably believe" that their alleged misconduct was a violation of any federal or state rule or regulation, or that it constituted mismanagement, a gross waste of funds, or abuse of authority. Third, defendants argue that plaintiff has not established a causal link between the allegedly protected disclosure and the adverse employment action. I agree with each of these arguments.

## 1. Disclosure of Official Wrongdoing

Plaintiff argues that in raising concerns about the Bureau's relationship with PMSA in 2004 and 2005 she made disclosures protected under Or. Rev. Stat. § 659A.203(1). Plaintiff relies on the Oregon Court of Appeals' interpretation of § 659A.203(1) in Bjurstrom v. Oregon Lottery, 292 Or. App. 162, 120 P.3d 1235 (2005). There, after finding that "the term 'disclose' may be understood to mean, in a general sense, 'to make known' or to 'open up to general knowledge,'" the court held that protected disclosures include "reports of wrongdoing within an agency or department." Id. at 169, 171 (citation omitted). This court must apply the Bjurstrom analysis to the extent that the Court of Appeals' holding is applicable. See Ryman v. Sears, Roebuck & Co., 505 F.3d 993, 995 (9th Cir. 2007). Plaintiff maintains that a

9   -  OPINION AND ORDER

question of fact exists as to whether she disclosed wrongdoing under <u>Bjurstrom</u>.

Defendants contend that <u>Bjurstrom</u> is not controlling, because it did not address whether intra-agency reports of wrongdoing "constitute disclosures if the reports do not reveal information that was previously secret and not known." Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defendants' Memorandum"), p. 10. Instead, defendants urge the court to follow <u>Clark v. Multnomah County</u>, 2007 WL 915175 (D. Or. 2007), in which Magistrate Judge Hubel found that reports of wrongdoing are not "disclosures" unless they are made "to a person who was previously unaware of the information, meaning someone 'in a supervisory position, other than the wrongdoer himself.'" 2007 WL 915175, at *14 (quoting <u>Huffman v. Office of Personnel Mgmt.</u>, 263 F.3d 1341, 1351 (Fed. Cir. 2001)). According to defendants, plaintiff did not disclose any new information, because everything she reported to her supervisor and colleagues was information they already knew. Plaintiff counters that <u>Clark</u>'s requirement of "new information" goes beyond the statutory requirements.

I agree with plaintiff that <u>Bjurstrom</u>'s interpretation of § 659A.203(1) is controlling, but find that any difference between the cases is irrelevant here. In terms of the Bureau's relationship with PMSA, plaintiff did not "make known" or "open up to general knowledge" any wrongful conduct within the Bureau to Santner or her colleagues. See <u>Bjurstrom</u>, 292 Or. App. at 169.

10    -  OPINION AND ORDER

Santner and others, particularly Turpel and Schulz, already knew of
the PMSA subsidies and most - if not all - of the Park management
issues to which plaintiff objected. See, e.g., Huff Deposition,
pp. 111-112; Schulz Deposition, pp. 107-109, 178-182; Turpel
Deposition, pp. 44-52, 183-185. Even if, as plaintiff alleges,
Santner was not familiar with each of the minor details plaintiff
related regarding the Bureau's relationship with PMSA, plaintiff's
communications did not disclose official wrongdoing as contemplated
by the statute and Bjurstrom.

   2. Reasonable Belief of Official Wrongdoing

   To be eligible for protection under § 659A.203(1), a plaintiff
must reasonably believe that she is disclosing a violation of a
federal or state law, rule or regulation, or mismanagement, gross
waste of funds or abuse of authority. Plaintiff argues that her
complaints about the Bureau's relationship with PMSA qualify in two
ways: they related to mismanagement or a gross waste of funds under
§ 659A.203(1)(b)(B), and they related to violations of a City
policy under § 659A.203(1)(b)(A). I disagree.

   The Bjurstrom court found that, under § 659A.203(1),
"mismanagement" refers only "to serious agency misconduct having
the effect of actually or potentially undermining the agency's
ability to fulfill its public mission." 292 Or. App. at 173.
Plaintiff fails to present evidence that she reasonably believed
the Bureau's actions or policies rose to this level of wrongdoing.
Nor does plaintiff establish that she identified a gross waste of

11  - OPINION AND ORDER

funds or abuse of authority.  Instead, plaintiff's communications more accurately reflect policy disagreements regarding the funding of the Park; plaintiff simply disagreed with other Bureau managers about the appropriateness of the Bureau's budgetary allocations and subsidies for PMSA.  As plaintiff's own brief describes, "she _believed_ that the City was _excessively_ subsidizing operations at Delta Park and therefore PMSA."  Plaintiff's Memorandum, p. 19 (emphasis added).  Even if plaintiff shed some new light on the necessity, or lack thereof, of the subsidies and related budget issues, she presents no evidence that she reasonably believed that this additional information revealed "serious agency misconduct" that threatened the Bureau's operations.  Critically, plaintiff admits that she never implied to the Bureau's management that she thought the City's interaction with PMSA was illegal.  Huff Deposition, p. 118.

Contrary to plaintiff's implications, the City Auditor's report did not confirm or uncover any serious agency misconduct or gross waste of funds.  Although the audit concluded that the subsidization of PMSA was not warranted, it labeled the relationship between the Bureau and PMSA a "qualified success." Nakomoto Decl., Ex. C., p. 11.  While one could infer from the audit that Santner and others "mismanaged" the PMSA relationship in the sense of not making optimal decisions about funding allocations, nowhere does the audit support allegations of misconduct under § 659A.203(1) and Bjurstrom.

12    -  OPINION AND ORDER

Finally, plaintiff's reliance on a 1992 Binding City Policy, BCP-FIN-2.02, as a "rule or regulation" that the Bureau violated under § 659A.203(1)(b)(A), is misplaced.  Prior to her memorandum opposing summary judgment, plaintiff never mentioned this rule, entitled Comprehensive Financial Management Policy, which mandates efficient cost recovery.  Plaintiff's previous failure to articulate this basis for her actions undermines any contention that she reasonably believed a City policy was being violated.  Moreover, "[e]ven if the [City's] policy could be fairly characterized as a political subdivision's regulation, the statute limits the category of protected speech to 'federal or state law, rule or regulation' and does not include local regulations."  Baynton v. Wyatt, 2007 U.S. Dist. LEXIS 18521, *26 n.2 (D. Or. 2007) (granting defendants' motion for summary judgment on an Oregon whistleblowing claim).

Therefore, as a matter of law, plaintiff's complaints were not protected disclosures under Or. Rev. Stat. § 659A.203(1).

### 3. Causation

In the alternative, even if plaintiff's complaints were protected disclosures, she cannot show a causal connection between her complaints and her termination.  Plaintiff bears the burden of establishing that her alleged disclosures constituted "a substantial factor" in the discontinuation of her employment.  McPhail v. Milwaukie Lumber Co., 165 Or. App. 596, 603, 999 P.2d 1144, 1149 (2000).  Plaintiff admits that the reorganization of the

13    - OPINION AND ORDER

Bureau was not undertaken to eliminate her employment. Huff Deposition, pp. 166-171. Unlike her colleagues who maintained their employment following the reorganization, plaintiff failed to apply for a new Tier One position. Id. Thus, plaintiff relies on the following adverse actions to establish causation: (1) her exclusion from the CMT; (2) the CMT's alleged decision to reformulate her Tier One position to emphasize experience she lacked; (3) allegedly being discouraged from re-applying for the new Tier One position by Santner's assistant, Darlene Carlson; and (4) the City's decision not to redeploy plaintiff to the Tier Two business operations manager position.

First, plaintiff argues that because she was responsible for close to half of the Bureau's budget, she wrongfully was omitted from the CMT. However, plaintiff provides no evidence that defendants had any obligation to include her on the CMT, or that her exclusion from the CMT resulted in the termination of her employment.

Second, plaintiff offers no evidence suggesting that the CMT reformulated her Tier One position with the objective of undermining her potential candidacy. Indeed, Santner and the City's Bureau of Human Resources – not the CMT – developed the classifications for the new Tier One positions. Santner Deposition, pp. 102-105; Turpel Deposition, pp. 146-147. The only evidence plaintiff cites to support her claim that the CMT added the requirement of recreational experience for the Tier One

14  – OPINION AND ORDER

position is her recollection that Grimwade told her this.  Huff
Deposition, pp. 180-181.  Even if that is true, there is no
evidence beyond plaintiff's allegations to suggest that the CMT (or
Santner or the Bureau of Human Resources) added the recreational
experience requirement in order to undermine plaintiff's potential
re-application.  Indeed, Santner stated at her deposition that
plaintiff _was_ qualified for the reclassified Tier One position.
Santner Deposition, p. 107.  Plaintiff's failure to apply for the
position renders any doubts about Santner's statement nothing more
than speculation.

Third, plaintiff presents no evidence to support her
allegation that Santner directed Carlson to discourage plaintiff
from applying for a new Tier One position, thus rendering it
"futile" for her to re-apply.  In plaintiff's words, Carlson "had
indicated to me that [Santner] wanted a change in her tier one
management group," and Carlson "told [me] I wasn't going to be
considered for one of those positions."  Huff Deposition, pp. 175-
76.  But Santner denies ever directing Carlson to discourage
plaintiff.[2]  Santner Deposition, p. 108.  Even if Carlson did make
those statements, plaintiff admits Carlson never told her not to
apply.  Huff Deposition, p. 178 ("[Carlson] did not say don't apply
for them.").  Hence, plaintiff's allegation that applying for a
Tier One position would have been futile, because she "knew that

---

[2]There are no direct statements from Carlson in the record.

15  -  OPINION AND ORDER

Santner did not want her on the Tier 1 management team," is too
speculative. Plaintiff's Memorandum, p. 12.

Fourth, there is no genuine issue of material fact regarding
the City's decision not to redeploy plaintiff. Plaintiff asserts
that defendants failed to comply with the City's redeployment
policy, found in Administrative Rule 7.04, by not giving her
"priority consideration" for the Tier Two Business
Operations/Finance Manager position. Plaintiff also suggests that
Santner may have told Grimwade, who was in charge of filling the
position, not to rehire her, or that Grimwade would have been well
aware of Santner's distaste for plaintiff due to her exclusion of
plaintiff from the CMT.

The Bureau did follow the City's redeployment policy.
Pursuant to Administrative Rule 7.04, Margaret Evans, a coordinator
in the City's Bureau of Human Resources, contacted the hiring
manager for the Tier Two position, Grimwade, and gave him
plaintiff's resume. See Affidavit of Margaret Evans, ¶3. At that
point, Grimwade had three options: hire plaintiff and skip the
competitive recruitment process; include plaintiff in the
competitive recruitment process; or decline to interview plaintiff,
if he believed she was unqualified. Id. ¶5. Pursuant to his
discretion, Grimwade opted for the second alternative and included
plaintiff among the candidates whom the hiring panel would
interview. The parties agree that the City "does not guarantee
placement of an employee" pursuant to Rule 7.04. Nakamoto Decl.,

16   -  OPINION AND ORDER

Ex. H, City of Portland Rule 7.04. Rather, the redeployment policy granted Grimwade, as the hiring manager, full discretion as to whether to rehire a laid-off worker. Evans Aff., ¶6.

Moreover, defendants provide depositions from the three City employees who interviewed plaintiff (Jack Graham, Janet Bebb, and Denise Kleim). Each describes the reason why plaintiff was not selected: she was weak in the areas of budget and budget development. Graham Deposition, p. 25; Bebb Deposition, p. 17; Kleim Deposition, p. 18. All three interviewers stated they were unaware of Huff's complaints about PMSA or any ill will between Huff and her colleagues. Graham Deposition, p. 30; Bebb Deposition, pp. 24-25; Kleim Deposition, p. 17. Plaintiff sets forth no evidence, aside from her own speculation, that the three interviewers had improper motives or that Santner was involved in any way in the decision-making process for the Tier Two position. See Evans Aff., ¶15.

By pointing to separate events – and actions by different City employees – that allegedly contributed to the end of her employment with the Bureau, plaintiff presents a shifting target that muddles her theory of causation. In effect, plaintiffs asks the court to view distinct events together as whole, so that a favorable inference may be drawn as to causation. However, defendants put forth credible and undisputed evidence to justify each of the events that led to the termination of plaintiff's employment and her failure to be redeployed. Plaintiff argues that the fact that

17   –  OPINION AND ORDER

her adverse treatment occurred shortly after her criticisms of Bureau management by itself is sufficient to create an inference of causation. See Ryan v. Patterson, 2000 WL 640859, **37-38 (D. Or. 2000). Given the overwhelming evidence undermining plaintiff's allegations, I cannot agree. Hence, in addition to plaintiff's inability to establish that she disclosed official wrongdoing under Or. Rev. Stat. § 659A.203(1), I find that there is no genuine issue of material fact regarding causation, and I grant the defendants' motion for summary judgment on this claim.

B. Wrongful Discharge

"The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be 'wrongful.'" Thorson v. State of Oregon, 171 Or. App. 704, 709, 15 P.3d 1005, 1008 (2000) (quoting Moustachetti v. State of Oregon, 319 Or. 319, 325, 877 P.2d 66, 69 (1994)); see also Santrizos v. Evergreen Fed. S&L Ass'n, 2007 U.S. Dist. LEXIS 84819 (D. Or. 2007). Defendants argue that plaintiff's wrongful discharge claim fails as a matter of law because plaintiff does not allege that she was wrongfully discharged, but rather that the Bureau did not rehire her. I agree.

As discussed above, plaintiff does not argue that the defendants' reorganization effort was undertaken to terminate her employment. Huff Deposition, pp. 166-171. Indeed, all of plaintiff's peers in Tier One positions faced the same process as she did: the Bureau eliminated their positions, and they had the

18   - OPINION AND ORDER

option of re-applying for the newly formulated positions. Of course, plaintiff failed to apply for a new Tier One position. Hence, plaintiff cannot allege that the termination of her Tier One position was wrongful. Likewise, plaintiff offers no evidence that her termination on June 30, 2005 from her temporary appointment constituted a wrongful discharge.

Nonetheless, plaintiff focuses on the poorly substantiated claim that the CMT redesigned the new Tier One positions so as to exclude her. Even if the CMT did change the requirements for her Tier One position, there is no evidence the CMT had improper motives. Regardless, plaintiff cites no case law supporting this as a basis for a wrongful discharge claim, given her admission that the Bureau's reorganization was not undertaken to eliminate her position.

Further, the City's decision not to select plaintiff for the Tier Two position for which she applied does not establish a wrongful discharge. Plaintiff cites no legal authority holding that a plaintiff's failure to be selected for a job was a wrongful discharge. Cf. Collins v. CNF Service Co., 2005 WL 475352, *7 (D. Or. 2005) ("An employee cannot be discharged from a job that he or she does not have."); Moore v. Portland Development Comm'n, 1999 WL 373789 (D. Or. 1999) (finding that, after plaintiff's job had been outsourced, plaintiff "had to apply for a new position with [defendant]. [Defendant] could not wrongfully discharge [plaintiff] from a position which she did not yet have. Thus, [defendant's]

19  - OPINION AND ORDER

failure to hire her was not a discharge."). The out-of-state cases plaintiff relies upon are not on point. See Plaintiff's Supplemental Memorandum Re: Wrongful Discharge Claim.

Plaintiff also urges the court to conduct an inquiry into whether "the discharge [was] for exercising a job-related right that reflects an important public policy," or whether "the discharge [was] for fulfilling some important public duty." Babick v. Or. Arena Corp., 333 Or. 401, 407, 40 P.3d 1059, 1062 (2002). However, both inquiries undermine plaintiff's position for the same reasons that her whistleblowing allegation fails: the mismanagement alleged by plaintiff did not rise to the necessary level of wrongdoing to satisfy either inquiry.

This case is distinguishable from Yeager v. Providence Health System Oregon, 195 Or. App. 134, 142-43, 96 P.3d 862, 866-67 (2004), upon which plaintiff relies under the "job-related right" prong, because there the Court of Appeals found that the plaintiff knowingly and in good faith invoked a statutory right prior to her discharge. Likewise, in the cases upon which plaintiff relies under the "public duty" prong, Oregon courts protected employees' duties to raise concerns about employers' violations of law. In contrast, here no evidence in the record suggests that plaintiff thought the Bureau's subsidization of PMSA was illegal when she made her complaints. Plaintiff relies on the Oregon whistleblower statute to show she was performing a public duty, but the failure of her whistleblowing claim dooms her wrongful discharge claim.

20    -    OPINION AND ORDER

Hence, plaintiff's wrongful discharge claim fails as a matter of law.

C. First Amendment Retaliation

Plaintiff brings a First Amendment claim against Santner. "In order to state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating' factor for the adverse employment action." Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003). Santner argues that plaintiff cannot establish the first and third elements of a prima facie case. I agree.

1. Protected Speech

"The inquiry into the protected status of speech is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7 (1983). The first step in determining whether plaintiff's speech is protected is analyzing whether she complained about PMSA pursuant to her official duties. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"). If a public employee's statements were not made pursuant to her official duties, the second step in the protected speech analysis is determining whether the statements involved a matter of public

concern.  See id. at 423 ("When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences.").

The parties disagree over whether plaintiff made her complaints pursuant to her official duties.  Plaintiff contends that the alleged mismanagement of the Park and PMSA was a subject over which Turpel and Schulz – and not plaintiff – had responsibility, and that identifying mismanagement in the Bureau's Recreation Division was not part of plaintiff's duties.  Santner counters that, as the Manager of the Bureau's Operations Division, plaintiff necessarily raised concerns about PMSA pursuant to her duties, as evidenced by her interactions with PMSA, Turpel, and Schulz to discuss the transfer of funds from her Operations Division budget to Turpel's Recreation Division budget.

The issue is not, as plaintiff implies, whether plaintiff had an official duty to report her suspicions of fiscal mismanagement. Rather, the issue is whether pursuant to her official duties, she made the complaints.  Garcetti, 547 U.S. at 421.  The inquiry must be "a practical one," and plaintiff's "written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties." Marable v. Nitchman, 511 F.3d 924, 932 (9th Cir. 2007) (quoting Garcetti, 547 U.S. at 425).

Unquestionably, plaintiff's job required interaction with PMSA

22   -  OPINION AND ORDER

and the Recreation Division.  Huff Deposition, pp. 35-38, 50-51, 58-59, 61-62, 64-66, 71-78.  Likewise, plaintiff's allegations of mismanagement of the Recreation Division and PMSA budgets arose out of her own budget oversight responsibilities.  Id. pp. 36-38, 110. Moreover, it was plaintiff's official involvement in preparing a cost-of-services report that made her aware of the allegedly problematic subsidization of PMSA, even though the subsidies came from other managers' budgets.  Id. pp. 65-70.  And in helping to prepare the report, plaintiff was charged with identifying potential inaccuracies, such as the actual cost of softball services to the City, which she did.  Id. pp. 131-135.

Plaintiff also argues that during her temporary reassignment from January to June 2005, on her own initiative and at her own expense, she obtained PMSA's publicly-available tax records showing the inaccuracy of a PMSA revenues and expenses statement provided to her by Grimwade.  While her investigative techniques arguably were beyond her job duties, during that time she was responsible for evaluating the City's contractual relations with PMSA.  Huff Deposition, pp. 190-191.  Hence her actions, no matter how independent, were pursuant to her official mandate.[3]

The link between plaintiff's duties and her complaints is far

_____

[3]Moreover, even if plaintiff independently investigated the PMSA matter after Grimwade told her to stop working on it in April 2005, plaintiff cannot establish that any adverse employment action resulted.  Her temporary employment already was scheduled to end, and the hiring panel already had rejected her for the Tier Two position.

23    -  OPINION AND ORDER

closer than in the case she cites for support.  See Marable, 511
F.3d at 930-34 (reversing a grant of summary judgment for employer
where the employee, a ferry engineer, had reported his superiors'
overpayment schemes); cf. Freitag v. Ayers, 468 F.3d 528, 545-46
(9th Cir. 2006) (finding that a prison employee's internal
complaints about her supervisors' misconduct were part of her
official duties, but that her complaints to a state senator and
state inspector general about the same misconduct were not part of
her official duties); Traxler v. Multnomah County, 2008 WL 282272,
*18 (D. Or. 2008) (granting summary judgment where an employee in
the payroll unit raised concerns about the timekeeping systems and
employee abuse of overtime and sick leave).  Given plaintiff's
budget responsibilities and participation in the cost-of-services
report, her complaints about the Bureau, PMSA, and the Park were
made, as a practical matter, pursuant to her official duties.
Accordingly, her speech was not protected under the First
Amendment.[4]

   2. Causation

   In the alternative, even if plaintiff's complaints were not
made pursuant to her official duties, and they did involve matters
of public concern, as a matter of law plaintiff has not established
that her speech was a "'substantial or motivating' factor for the

_____

        [4]Because plaintiff's complaints were made pursuant to her
official duties and therefore are not protected under the First
Amendment, the court does not address whether they involved
matters of public concern.  See Garcetti, 547 U.S. at 421-23.

adverse employment action." <u>Coszalter</u>, 320 F.3d at 973. Plaintiff argues that the temporal proximity between her allegedly protected speech and Santner's alleged retaliation creates a triable issue of fact. <u>See Marable</u>, 151 F.3d at 929-930 (finding that an employee could survive an employer's summary judgment motion by "point[ing] to the temporal proximity between his alleged protected speech and the retaliatory conduct").

Here, however, the causation analysis is complicated by the distinct adverse employment actions to which plaintiff refers. As described above, these include: (1) her exclusion from the CMT; (2) the CMT's alleged decision to reformulate her Tier One position so as to emphasize experience she lacked; (3) allegedly being discouraged from applying for the reformulated Tier One position by Santner's assistant, Darlene Carlson; and (4) the City's failure to redeploy plaintiff to the Tier Two business operations manager position.

Of course, unlike her colleagues, plaintiff failed to apply for a newly formulated Tier One position, allegedly because Santner's assistant Carlson "all but told [her] she was not going to get a Tier 1 manager position." Plaintiff's Memorandum, p. 31. Plaintiff cites <u>Gifford v. Atchison, Topeka & Sante Fe Ry. Co.</u>, 685 F.2d 1149, 1154 (9th Cir. 1982), for the proposition that an employee need not have applied for a position if any such application would have been futile. In <u>Gifford</u>, the Ninth Circuit qualified its approval of plaintiff's argument by noting that the

25   -  OPINION AND ORDER

plaintiff would be "correct if the employer's promotional policies made application futile, or if the employer normally initiated the promotion." Id.; see also Reed v. Lockheed Aircraft Corp., 613 F.2d 757, 761 (9th Cir. 1980) (reversing a grant of summary judgment in favor of an employer, because although the employee never personally was denied admission to a training program, the employee alleged that the employer's system for choosing candidates was racially discriminatory). Those two contingencies are absent here: plaintiff does not allege that Santner "normally initiated" rehiring Tier One managers without formal application, nor does she allege or substantiate that Santner's "promotional policies made application futile." Therefore, plaintiff cannot rely on the reclassification of her prior position to support her claim.

Because plaintiff does not bring the First Amendment claim against the City, the fourth adverse action she alleges – the City's failure to redeploy plaintiff – is even weaker here than under the whistleblower claim. Plaintiff has brought forth no evidence linking Santner to the hiring panel's – and Grimwade's – decision not to hire plaintiff for the Tier Two position. That Santner was Grimwade's supervisor is an insufficient foundation for plaintiff to base her claim. Likewise, that Santner allegedly once told plaintiff, at some unspecified time, which candidate Santner favored for an unspecified opening in plaintiff's Division does not establish a pattern of Santner's involvement in lower-level hiring decisions. See Huff Declaration, ¶34. Indeed, unlike the instance

26   –  OPINION AND ORDER

plaintiff vaguely recollects, here plaintiff does not allege that
the hiring panel or Grimwade sought out Santner's advice.

In all other respects, the causation inquiry here largely
mirrors the causation analysis under the state law whistleblower
claim.  Santner has put forward substantial evidence to justify
each separate event that led to the end of plaintiff's employment.
By relying on separate, tenuously linked events to show causation,
plaintiff underscores her inability to show that her complaints may
have been a substantial or motivating factor for any single action
by Santner.  As with the protected speech inquiry, there is no
genuine issue of material fact regarding causation, and hence
plaintiff's First Amendment claim fails as a matter of law.

D. "Class of One" Equal Protection

Plaintiff argues that defendants treated her differently than
"others similarly situated, in an arbitrary and capricious manner,
without a rational basis, but instead based on spite and
animosity...."  Plaintiff's Memorandum, p. 14.  Defendants argue
that plaintiff's class-of-one equal protection claim fails as a
matter of law because of the Ninth Circuit's recent holding "that
the class-of-one theory of equal protection is inapplicable to
decisions made by public employers with regard to their employees."
Engquist v. Or. Dep't of Agric., 478 F.3d 985, 996 (9th Cir. 2007).
I agree.

Plaintiff counters that because the Supreme Court has granted
certiorari in Engquist (and several circuits disagree with the

27   -  OPINION AND ORDER

Ninth Circuit's position), the issue is unsettled and summary judgment would be premature. In support of her position, plaintiff cites to Hart v. Massanari, 266 F.3d 1155, 1170-71 (9th Cir. 2001). But Hart supports the defendants: the Hart court found that "[b]inding authority must be followed unless and until overruled by a body competent to do so." Id. at 1170 (emphasis added).

Moreover, even if the Supreme Court were to reverse the Ninth Circuit's holding in Engquist, plaintiff's class-of-one claim would fail as a matter of law. Cf. Lauth v. McCollum, 424 F.3d 631, 633-34 (7th Cir. 2005) (noting that the court was "not surprised to have found no 'class of one' cases in which a public employee has prevailed since the extreme case [Ciechon v. Chicago, 686 F.2d 511 (7th Cir. 1982)] that kicked off the 'class of one' movement more than two decades ago"). Plaintiff has provided no evidence supporting her claim that she was treated differently than other similarly situated employees, in an arbitrary and capricious manner. As plaintiff admits, all the Tier One positions were reformulated and she failed to apply for a new Tier One position (unlike her allegedly similarly situated colleagues) – thus undermining any potential class-of-one claim. Hence, plaintiff's equal protection claim fails as a matter of law.

///

///

///

///

28  -  OPINION AND ORDER

## CONCLUSION

Plaintiff's claims for whistleblower retaliation under Or. Rev. Stat. § 659A.203, wrongful discharge, and violations of her First Amendment and equal protection rights under 42 U.S.C. § 1983 each fail as a matter of law. Therefore, defendants' motion for summary judgment (doc. #49) is GRANTED.

IT IS SO ORDERED.

Dated this __23__ day of April 2008.

_____
Ann Aiken
United States District Judge

29    -   OPINION AND ORDER